Albert J. DOHERTY, Plaintiff-Appellee,

v.

AMERICAN MOTORS CORPORATION, a foreign corporation, Defendant-Appellant.

No. 80–1655.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 8, 1982.

Decided Feb. 24, 1984.

Dennis M. Haffey, Brian M. Haffey, George Bashara argued, Detroit, Mich., for defendant-appellant.

William J. Weinstein argued, Joel Lee Hoffman, Weinstein, Kroll & Gordon, Southfield, Mich., for plaintiff-appellee.

Before EDWARDS and ENGEL, Circuit Judges, and WEICK, Senior Circuit Judge.

ENGEL, Circuit Judge.

The record in the jury trial from which the defendant American Motors Corp. (AMC) appeals demonstrates in classical fashion the moral and ethical problems which arise when a corporation and its officers allow themselves to become enmeshed in unlawful activities and, once discovered, seek to extricate themselves. The hoped-for gains, in retrospect, seem paltry indeed, compared to the ultimate cost in effort, money, and reputation. A major American corporation found itself indicted for violation of federal law. It was obliged by the circumstances to enter negotiated pleas and, in the civil litigation reflected in this appeal, to confront an adverse jury award in favor of the plaintiff which totaled in excess of $1,000,000. Because we hold that the plaintiff failed to present *prima facie* proof of conspiracy under 42 U.S.C. § 1985(2) (Supp. V 1981), we vacate the judgment entered upon the general jury verdict and remand for further proceedings.

To give focus to the issues, the facts will be initially addressed in summary fashion with more detailed development included in the discussion of the individual issues which have been raised on appeal.

## I.

Plaintiff Albert J. Doherty joined American Motors Corporation in 1961 as the Director of AMC's Far Eastern operations. Doherty's initial function was to supervise all AMC distributors and dealers in the area, and he was stationed from time to time in several different locations throughout the Far East. In 1969 or 1970, however, Doherty's responsibilities were restricted to overseeing sales to the United States military forces in the Far East. He operated primarily out of the Philippines.

On August 13, 1973, American Motors Corporation, two of its employees, Doherty and John Houtaling, and three others were indicted in the United States District Court for the Western District of Tennessee. The indictment charged AMC, Houtaling, and Doherty with bribery of, and conspiracy to bribe, a United States government official in connection with the sale of nineteen automobiles to the United States Naval Base at Sangley Point in the Philippines. On December 16, 1974, after trial had been in progress for one week, AMC, Doherty, and Houtaling each entered negotiated pleas of *nolo contendere*. These pleas were not opposed by the government, and thereafter United States District Judge Bailey Brown accepted the pleas and imposed fines of $15,000 on AMC and $3,000 each on Doherty and Houtaling. AMC paid both its own fines and those imposed on the two individual defendants.

Doherty continued in the employment of AMC until being involuntarily "retired" by AMC five months later. In August, 1975, approximately nine months after his plea and sentencing, Doherty moved to set aside the plea of *nolo contendere* in the district court claiming that his plea was not freely and voluntarily made but was the result of coercion, fraud and misrepresentation, duress, intimidation, and undue influence on the part of AMC. After a hearing on October 17, 1975, Judge Brown denied the motion, expressing his opinion that the *nolo* plea was voluntarily made, and finding that its primary inducement was Doherty's concern for the possibility of a prison sentence if the trial continued and he was convicted. Although Doherty appealed this decision to this court, the appeal was dismissed on May 24, 1976 for want of prosecution. Thereafter, Doherty filed a complaint in the United States District Court for the Eastern District of Michigan alleging that his *nolo* plea was induced by threats, coercion and intimidation from AMC. Federal question jurisdiction was premised upon claims of an

unlawful conspiracy to deter Doherty from attending and testifying truthfully as a witness and a party in a United States court, in violation of the Civil Right Act of 1861. 42 U.S.C. § 1985(2). Doherty also invoked the pendent jurisdiction of the court over Michigan state law claims of tort, conspiracy, and fraud. After an extensive trial, the jury returned a verdict in favor of Doherty and against AMC in the amount of $149,000 actual damages and $910,600 exemplary damages. This appeal followed.

AMC asserts that the district court's refusal to set aside Doherty's *nolo contendere* plea in the criminal bribery proceedings collaterally estopped him from challenging the voluntariness of his plea in these proceedings. Thus, AMC maintains, the district court here should have directed a verdict in AMC's favor on the basis that the voluntariness of Doherty's plea was established as a matter of law. AMC also claims that each of Doherty's other theories of recovery is flawed. Particularly, it claims that his cause of action under 42 U.S.C. § 1985(2) must fail for three reasons. First, there is no proof of racial or other class-based animus. Second, the conspiracy requirement of "two or more persons" under the statute cannot be satisfied. Third, the actual conduct proved does not amount to an unlawful deterrence from "attending or testifying" in court for the purposes of the civil rights statute. AMC also asserts that Doherty's purported causes of action under common law tort, conspiracy and fraud must fail for want of sufficient proof. Finally, AMC complains that the award of exemplary damages was improper under Michigan law, both because it was excessive and because the damages were punitive and not compensatory in nature.

### II.

■ AMC's first defense on appeal is that under the doctrine of collateral estoppel, Doherty was prohibited from asserting in this action that his earlier plea of *nolo contendere* was coerced and, hence, involuntary.

AMC concedes that the plea itself is not a bar to Doherty's claims. On the contrary, a plea of *nolo contendere* is a confession only for the purpose of the criminal prosecution and does not bind the defendant in a civil action for the same wrong. *Berlin v. United States,* 14 F.2d 497 (3d Cir.1926); *United States v. One Chevrolet Stylemaster Sedan,* 91 F.Supp. 272, 275 (D.Colo.1950). With certain exceptions not applicable here, Rule 410 of the Federal Rules of Evidence further provides that evidence of a plea of *nolo contendere* is not admissible against the defendant who made the plea. As the Notes of the Advisory Committee in the proposed rules observe:

> Pleas of *nolo contendere* are recognized by Rule 11 of the Rules of Criminal Procedure, although the law of numerous states is to the contrary. The present rule gives the effect of the principal traditional characteristic of the *nolo* plea, i.e., avoiding the admission of guilt which is inherent in pleas of guilty.... Exclusion of offers to plead guilty or *nolo* has as its purpose the promotion of disposition of criminal cases by compromise ... (citations omitted).

Fed.R.Evid. 410 advisory committee note.

■ AMC does argue, however, that the issues raised by Doherty in this civil action were already adjudicated in the criminal action. In denying AMC's motion for summary judgment in the district court, District Judge John Feikens correctly analyzed this argument as follows:

> Defendant urges in its motion that, while the plea of nolo contendere itself is not a bar to plaintiff's claims, the denial of the motion to set aside the plea does operate as collateral estoppel. It contends that the issues of coercion, duress, fraud, and voluntariness were fully litigated and adjudicated by the court in denying the motion. I find it unnecessary to determine what issues were distinctly raised and directly determined by the court in denying the motion, because the distinctly different standard of proof

in that proceeding renders the doctrine of collateral estoppel inapplicable.

We agree.

Judge Feikens continued his explanation by observing that it is well established that different standards of proof may render the doctrine inapplicable in a subsequent case even between the same parties. *See United States v. National Association of Real Estate Boards,* 339 U.S. 485, 492–93, 70 S.Ct. 711, 715–716, 94 L.Ed. 1007 (1950); *Polcover v. Secretary of the Treasury,* 477 F.2d 1223 (D.C.Cir.) *cert. denied,* 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). *See also* 1B J. Moore, Moore's Federal Practice, 0.418[1] (2d ed. 1983). In ruling that different standards of proof applied to the setting aside of a *nolo* plea and to the establishment of whether the act of pleading *nolo contendere* was voluntary, we note that the burden of proof upon the plaintiff was only to establish such duress, coercion, or involuntariness by a preponderance of the evidence. While the authorities differ in their description of the burden of proof upon a moving party to set aside a plea of *nolo contendere* after it has been accepted, the cases, as pointed out by Judge Feikens, generally rely on Federal Rule of Criminal Procedure 32(d) which provides:

(d) **Withdrawal of Plea of Guilty.**

A motion to withdraw a plea of guilty or *nolo contendere* may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his plea.

■ Thus, under Rule 32(d) it is clear that the burden is upon the movant to establish that manifest injustice has occurred. *See United States v. Michaelson,* 552 F.2d 472 (2d Cir.1977); *Sherburne v. United States,* 433 F.2d 1350 (8th Cir.1970); *United States v. Giuliano,* 348 F.2d 217 (2d Cir.1965). The courts appear also to be in agreement that the trial court has "wide discretion" under Rule 32(d) to determine whether to set aside the plea, and that the standard on appeal is whether the judge

abused his discretion. *United States v. Carabbia,* 512 F.2d 34, 36 (6th Cir.1975); *United States v. Saft,* 558 F.2d 1073, 1082 (2d Cir. 1977). Further, as pointed out by Judge Feikens the burden of proof faced by the plaintiff is a "heavy one." *United States v. McNair,* 18 F.R.D. 417 (D.D.C.1955), *aff'd,* 235 F.2d 856 (D.C.Cir.1956), *cert. denied,* 352 U.S. 989, 77 S.Ct. 389, 1 L.Ed.2d 368 (1957). As the D.C. Circuit has observed, a defendant should be allowed to withdraw a guilty plea only in "extraordinary cases." *United States v. Roberts,* 570 F.2d 999, 1008 (D.C. Cir.1977).

It might be argued that a sentencing judge could allow a withdrawal of a guilty plea upon a finding of manifest injustice supported by a preponderance of the evidence, and that therefore the burden of proof is no greater than that in an ordinary civil case such as here. However, because the plaintiff's burden of proof is heavy, and a guilty plea can only be withdrawn in extraordinary cases, we believe that more than a mere preponderance of the evidence would be required before a trial judge would set aside a plea once it was duly entered and sentence was imposed. We therefore agree with Judge Feikens' conclusion that there is a difference in the standards of proof which precludes the application of the doctrine of collateral estoppel.

## III.

■ The federal question jurisdiction invoked by Doherty is premised upon his claim that he was forced by threats and intimidation to answer falsely at his plea hearing and to enter a plea of *nolo contendere* although he was not in fact guilty. All of this amounts, Doherty claims, to a conspiracy against him within the meaning of 42 U.S.C. § 1985(2). This section provides the injured party with an action for the recovery of damages

[i]f two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein,

freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

With respect to this particular cause of action, AMC first claims that racial or other class-based animus is required in order to state a cause of action for a conspiracy to deter testimony within the meaning of section 1985(2).

Whatever uncertainty may have existed at the time the issue was raised, it appears now that Judge Feikens' ruling to the contrary has been fully supported by the decision of the Supreme Court in *Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983). In *Kush,* the Court held that the portion of section 1985(2) relating to the intimidation of witnesses in federal courts did not require allegations of class-based animus. We therefore conclude that the trial judge did not err in denying summary judgment on that basis.

## IV.

AMC's next assertion, which does have merit, is that the plaintiff failed to prove that AMC was engaged in a conspiracy within the meaning of the statute.

To sustain a cause of action under 42 U.S.C. § 1985(2), a plaintiff must prove the existence of a conspiracy among "two or more persons." Doherty's complaint alleged that AMC as a corporation conspired with the following persons: Forrest Hainline, in-house counsel to AMC; Joseph Vieson and Jay A. Herbst of the Detroit law firm of Cross, Wrock, Miller & Vieson, outside counsel to AMC; Lucius Burch and Charles Newman of the Memphis law firm of Burch, Porter & Johnson, Memphis counsel engaged as local counsel to represent AMC; and, finally, James M. Manire, counsel who was engaged by AMC to represent Doherty in the latter's own defense in the criminal proceedings. The difficulty is that, with the exception of Mr. Manire, all of the persons named were either employees or agents of AMC.

AMC urges the general rule in civil conspiracy that a corporation cannot conspire with its agents or employees. *See generally Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). The rationale of the Fifth Circuit in *Nelson Radio* has generally been accepted:

> It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.

200 F.2d at 914. While *Nelson Radio* dealt with an alleged conspiracy under section one of the Sherman Act, 15 U.S.C. § 1 (1982), the same rule has been consistently applied in allegations of conspiracy under the Civil Rights Act. Thus, in *Herrmann v. Moore,* 576 F.2d 453 (2d Cir.), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978), the plaintiff had alleged a conspiracy between an educational corporation, the Brooklyn Law School, and its trustees and employees. In denying the plaintiff's claim under section 1985(2), the court repeated the "familiar doctrine" that "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." 576 F.2d at 459. The same

rule has been applied frequently throughout the country. *Girard v. 94th Street & Fifth Avenue Corp.,* 530 F.2d 66, 70 (2d Cir.), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Baker v. Stuart Broadcasting Co.,* 505 F.2d 181 (8th Cir.1974); *Dombrowski v. Dowling,* 459 F.2d 190, 196 (7th Cir.1972); *Sciolino v. Marine Midland Bank-Western,* 463 F.Supp. 128, 134 (W.D. N.Y.1979); *Coley v. M & M Mars, Inc.,* 461 F.Supp. 1073, 1077 (M.D.Ga.1978); *Jones v. Tennessee Eastman Co.,* 397 F.Supp. 815, 816 (E.D.Tenn.1974), *aff'd,* 519 F.2d 1402 (6th Cir.1975); *Fallis v. Dunbar,* 386 F.Supp. 1117, 1121 (N.D.Ohio 1974), *aff'd,* 532 F.2d 1061 (6th Cir.1976).

■ Doherty, however, argues that this general rule does not apply either to in-house counsel or to outside counsel. His proposition fails of any support. In *Burch v. Snider,* 461 F.Supp. 598, 601 (D.Md.1978), *Nelson Radio* was relied on as authority for the proposition that "[j]ust as a corporation cannot act except through its agents and officers, it generally cannot participate in litigation except through counsel." The rule of this circuit is that a corporation cannot appear in federal court except through an attorney. *Ginger v. Cohn,* 426 F.2d 1385, 1386 (6th Cir.1970); *United States v. 9.19 Acres of Land,* 416 F.2d 1244, 1245 (6th Cir.1969). Moreover, it is clear from the record that the actions of AMC's attorneys were motivated not by personal concerns but by concerns for their clients.

Proof of the existence of a conspiracy under section 1985(2) must therefore be found, if at all, in the relationship between AMC, its officers, agents, and attorneys, on the one hand, and James Manire, Doherty's counsel, on the other. From our examination of the record, we can ascertain no evidence whatsoever of unlawful or unethical conduct on the part of Mr. Manire, let alone conduct which would permit a jury to infer that he was conspiring with AMC to affect Doherty's right to testify in court or to appear in his own defense. The evidence is overwhelmingly to the contrary.

After being named with AMC in the August 13, 1973 indictment, Doherty, while vehemently insisting upon his innocence, expressed concern for the cost of his defense. Accordingly, he was notified by in-house counsel Forrest Hainline that AMC was willing to pay his legal expenses. This information was conveyed to Doherty in a letter from Hainline dated November 16, 1973. Hainline explained that AMC's corporate authority for such action was found in Article II, Section 9(i) of the corporation's bylaws. This section states: "The Corporation may also, *as provided by law,* indemnify . . . any person who is or was an employee or agent of the Corporation . . . ." (emphasis added). Maryland law, to which AMC is subject as a Maryland corporation, provides that: "Expenses (including attorney fees) incurred in defending a civil or criminal action, suit or proceeding may be paid by the corporation in advance of the final disposition thereof." [1] Md.Corps. & Ass'ns Code Ann. § 64(a) (1977).

1. The entire provision of Article 23, section 64(a) is as follows:

Any corporation of this State may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the corporation) by reason of the fact that he is or was a director, officer, employee, or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise. The indemnification may be against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by him in connection with the action, suit, or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

Hainline's letter then described the conditions under which the corporation was allowed to indemnify Doherty under its by-laws and under Maryland law:

> You will be entitled to be indemnified against expenses actually and reasonably incurred by you in the defense of the action, if you are successful in the defense of the action or if it is determined at the conclusion of the action that you acted in good faith and in a manner you reasonably believed to be in or not opposed to the best interests of the Corporation and that you had no reasonable cause to believe your conduct was unlawful.

After the return of the indictment, Doherty was summoned back to the United States from the Far East to face the charges made against him by the Memphis, Tennessee grand jury. Before entering the United States, Doherty met in Windsor, Canada with John Sheridan, Jay Herbst, and Charles A. Watson. There they conferred extensively concerning the matter, undoubtedly as a means of having a free interchange of ideas before Doherty arrived in the United States, thereby avoiding the possibility of interference by the government. Watson was the head of the Export Division of AMC, while Sheridan and Herbst were respectively in-house counsel and outside counsel for AMC. Doherty testified at the trial that these men told him that they would "arrange a lawyer" for him, and that Herbst recommended Memphis attorney James Manire. Doherty was told at this meeting that AMC would pay for his attorney. He also testified that he didn't know any lawyers. Doherty was informed that he was free to choose any counsel he wished, and Herbst, particularly, emphasized that Doherty should have counsel of his own choice because Doherty's personal defense might not coincide with that of AMC and because Doherty should have full confidence in the attorney appointed. Doherty responded in a letter dated December 27 that Mr. Manire was acceptable, and that his only concern was Mr. Manire's fees.

Doherty's theory that Manire conspired somehow with AMC is based solely upon the fact that AMC originally recommended Manire as Doherty's attorney and agreed to pay Manire pursuant to Article 2, section 9(i) of AMC's bylaws, and Article 23, section 64(a) of the Maryland Corporation Law.[2] Doherty's theory at trial was, as he expressed in his brief, that Manire had somehow decided "to sell his client down the river [in order] to satisfy the wills and desires of ... AMC." The difficulty with the assertion is that there is simply no

---

2. In addition to being proper under Maryland law, it appears that AMC's payment to Manire was permitted by the Model Code of Professional Responsibility. The Model Code of Professional Responsibility Disciplinary Rule 5–107(A)(1) provides:

> (A) Except with the consent of his client after full disclosure, a lawyer shall not:
> (1) Accept compensation for his legal services from one other than his client.

This guideline was strictly adhered to; Doherty was completely aware of who was paying for Manire's services.

The corresponding ethical consideration provides that:

> A person or organization that pays or furnishes lawyers to represent others possesses a potential power to exert strong pressures against independent judgment of those lawyers. Some employers may be interested in furthering their own economic, political, or social goals without regard to the professional responsibility of the lawyer to his individual client. Others may be far more concerned with establishment or extension of legal principles than in the immediate protection of the rights of the lawyer's individual client. On some occasions, decisions on priority of work may be made by the employer rather than the lawyer with the result that prosecution of work already undertaken for clients is postponed to their detriment. Similarly, an employer may seek, consciously or unconsciously, to further its own economic interests through the action of the lawyers employed by it. Since a lawyer must always be free to exercise his professional judgment without regard to the interests or motives of a third person, the lawyer who is employed by one to represent another must constantly guard against erosion of his professional freedom.

Model Code of Professional Responsibility E.C. 5–23.

There is absolutely no indication that Manire's professional judgment in handling Doherty's defense was affected by his being paid by AMC.

factual support for it. There is not one instance in the record that could, upon examination, permit even an inference that Manire's conduct was dishonest, unethical, unwise, or contrary to his duty faithfully to represent Doherty. It is true, of course, that Manire was in regular consultation with counsel for AMC and for the other defendants. To have done otherwise would have been the height of foolishness. However, at no time did Manire ever give advice which could be reasonably construed as being either unfair or improper. Doherty himself testified that when they discussed the case, Manire told him that AMC and Houtaling didn't have a "chance in hell" but that Manire was convinced that Doherty "wasn't too bad off." Manire testified extensively at the trial, and his testimony was not factually controverted by Doherty. At no time could Manire's advice be deemed to have been coercive, and at no time did Manire indicate that he would abandon Doherty's defense should the latter elect to continue on to trial. The unquestioned truth was that after the trial had proceeded for a week, the case against AMC, Houtaling, and the other defendant, Austin, was strong, and that Manire had succeeded in at least putting some distance between Doherty and the other defendants. This is not to say that there was no pressure on Doherty at all. Doherty had three concerns at the time of entering his plea of *nolo contendere.*

First, he was concerned that he would be convicted and receive a jail sentence. Despite Doherty's constant and emphatic protestations of innocence, the record demonstrates that the pressures upon Doherty to plead *nolo contendere* were severe indeed, but they were severe not because of any improper or unlawful conduct on the part of Manire, but because of the nature of the case itself. However innocent he may have conceived himself to be, Doherty had been indicted by a federal grand jury in Memphis. That grand jury had found from evidence presented to it that there was probable cause to believe that he had been guilty of two felonies: first, conspiring to bribe a United States officer; and, second, aiding and abetting in the bribery of a United States officer. Manire advised Doherty what he was duty bound to advise him: that the charges were serious, that the potential penalty was a five-year prison term, with possibly another sentence for aiding and abetting, and that although Manire was reasonably confident, obviously he could not guarantee an acquittal.

Manire was justifiably concerned over certain aspects of the evidence which could be used against Doherty. The bribery did in fact take place, and thus the likelihood that the corporation and the Navy employee would be found guilty of a violation of federal law was very strong. Doherty was in charge of sales to the military in the Philippines. At the time of the bribery, he could rightfully claim that some of the transactions which ought normally to have gone through him, by-passed him when certain AMC employees became aware of Doherty's strong objections to anything which smacked of bribery. At the same time, Doherty admitted that certain of his correspondence could have been interpreted by an outsider to reveal both his knowledge of the bribery scheme and his complicity in it through the forwarding of papers by which the sale of the vehicles to the United States was consummated.

 Under federal criminal law, once an unlawful conspiracy has been established, it takes but "slight proof" to make the issue of individual involvement a jury question. *United States v. Richardson,* 596 F.2d 157, 162 (6th Cir.1979); *United States v. Mayes,* 512 F.2d 637, 697 (6th Cir.1975). This is a basic tenet of conspiracy law and was certainly known to Manire. Usually complicity of an individual in a conspiracy already established is proved by (1) knowledge of the conspiracy, and (2) some act which is done by that individual in furtherance of that conspiracy. *United States v. Shermetaro,* 625 F.2d 104, 108 (6th Cir. 1980); *United States v. Levinson,* 405 F.2d 971, 985 (6th Cir.1968), *cert. denied,* 395 U.S. 958, 89 S.Ct. 2097, 23 L.Ed.2d 744 (1969). In denying Doherty's motion to set aside the *nolo contendere* plea, Judge Brown observed that at trial he would probably have

denied motions for directed verdicts of acquittal and have allowed the case to go to the jury. Indeed, Judge Brown indicated that Doherty's chances of being convicted were good. In Judge Brown's words:

At the time [Doherty] changed his plea from not guilty to nolo, all the proof was in—all we had left was Austin's testimony; and if this case had gone to the jury with all the proof in, the Court feels there would have been a very definite chance he would have been convicted, and if he had been convicted, I would have given him some time without any question about it, instead of giving him a $3,000 fine, I would have given him three or four years in the penitentiary. Now, that being true, I can't see where the great complaint is.

Doherty's expressed distaste for the bribery would not have constituted a defense, nor would the relative degree of the guilt of the conspirators. Such factors might persuade a jury to acquit but would not guarantee it. It is interesting to note, also, that Doherty's decision to plead came just before John Howell was to be called as a government witness.

■ John Howell was the franchisee representing American Motors in the Philippines and was intimately associated with the plot to bribe the government official. According to Manire, Howell's testimony would have been damaging to Doherty and was Manire's biggest concern at trial. Manire was concerned because Howell and Doherty were not on good terms. As Manire stated, there were some "pretty raw exchanges between these two men." In addition, Manire discovered that Howell would testify that Doherty knew about the planned bribery and was receptive to and pleased with the deal. In light of Howell's proposed testimony and the other considerations noted above, Doherty had good cause to be worried about the outcome of the trial.

Second, Doherty was undeniably concerned about the impact the case would have on his future employment with AMC. Thus, in August, 1974, four months before the commencement of the criminal trial, Doherty had Manire draft a letter to AMC's counsel inquiring about the effect a conviction might have on his future employment at AMC. AMC's counsel responded that "no commitment could be made regarding the continuation of any person's employment following . . . a conviction." AMC's letter also made it clear that "any time continuation or termination of employment is being considered, all relevant factors and circumstances must be evaluated, one of which could be such a conviction." Doherty viewed the letter as a "direct threat." Although such a letter may have been considered by Doherty subjectively as a direct threat, in fact the letter did no more than outline the legal position which AMC had a right to take, and probably was required to take.

Lastly, Doherty was worried about having to pay his legal expenses. AMC had stated that if Doherty were not acquitted it might require Doherty to pay for his own defense. Doherty was convinced that he did not have the wherewithal to pay for his legal expenses.

Manire played no role in bringing these pressures to bear on Doherty; Doherty was fully aware of the consequences of a conviction. Nor is there any evidence that Manire acted voluntarily as a conduit through which AMC funneled job termination threats to Doherty. Manire acted at all times with complete fidelity to Doherty and his proper interests, and with that independence which was required of him as counsel and as an officer of the court. Manire advised Doherty of the options open to him, but left the final decision to Doherty. Doherty weighed his options and chose a *nolo* plea as his best alternative. Now he seeks to blame his lawyer for his decision. Manire did nothing more than explain the law to Doherty and discuss his options with him. That is the duty of an attorney. AMC's payment of Manire's fee upon Doherty's request is not enough to establish a conspiracy under section 1985(2). It was completely above board and in accordance with law. Indeed, had AMC not paid Do-

herty's attorney fees, Doherty would certainly have pointed to that fact as evidence that AMC was attempting to coerce him.

After the plaintiff rested, and at the close of the evidence, AMC's attorney moved for a directed verdict on Doherty's section 1985(2) claim. AMC's grounds for a directed verdict were that a corporation cannot conspire with its agents and that Doherty had failed to offer any evidence tending to establish a conspiracy between AMC and Manire. This motion should have been granted. AMC's motion for judgment n.o.v. pursuant to Fed.R.Civ.P. 50(b) should have been granted on the same grounds.

·After a careful review of the entire evidence of the trial, we conclude that Doherty at best was able to introduce proof of two theories. First, he introduced some proof that AMC failed to abide by an understanding that Doherty was to be employed by the company until the normal time for his retirement.[3] Second, Doherty introduced proof that he was induced to enter his plea of *nolo contendere* with the understanding that he was being promised such employment, but that at the time, AMC did not intend to fulfill its obligation. Instead, Doherty claims, AMC waited a respectable time and then forced him into an early retirement on pretextual grounds.[4]

## V.

██ Because the jury returned a general verdict, it is impossible to determine whether it based recovery on Doherty's section 1985(2) claim or on one of the other theories of recovery.[5] When one of several claims submitted to the jury should not have been submitted, "a general verdict, such as was rendered here … cannot stand." *Morrissey v. National Maritime Union of America,* 544 F.2d 19, 26 (2d Cir. 1976). "[T]here is no way to know that the invalid claim … was not the sole basis for the verdict." *United Pilots Association v. Halecki,* 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959). *See also Schultz v. Tecumseh Products,* 310 F.2d 426, 428 (6th Cir.1962).

## VI.

### CONCLUSION

Because we conclude that the section 1985(2) claim should not have been submitted to the jury and that the general jury verdict cannot stand, Doherty has lost his basis for federal question jurisdiction. It appears, however, from Doherty's complaint that he could establish diversity jurisdiction. On remand, Doherty should be allowed to establish diversity jurisdiction if he is able to.

Accordingly, the judgment of the district court is REVERSED and REMANDED for dismissal unless Doherty can establish diversity jurisdiction.

WEICK, Senior Circuit Judge, concurring in part and dissenting in part.

## I

I concur in that part of the well-written opinion of the majority to the effect that

---

3. Whether such conduct if believed by a jury would be sufficient to support an action for breach of contract under Michigan law is not explored in the briefs before us nor resolved by the district court, and we do not endeavor to resolve it here.

4. The pretext apparently involved AMC's ability to deal with the Navy while employing Doherty. AMC indicated that it retired Doherty because it was debarred from entering into contracts with the Navy while it employed someone with a criminal record. Doherty on his part claimed that he had obtained clearance from the Navy and that neither he nor AMC was debarred from Navy contracts on this account.

5. Neither side asked for special interrogatories or for special verdicts. Fed.R.Civ.P. 49. Even so, the general verdict cannot stand. In *Avins v. White,* 627 F.2d 637 (3d Cir.), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980), the Third Circuit considered a case in which two grounds for recovery should not have been submitted to the jury. As here, "no special interrogatories or verdict form were requested or sent to the jury." *Avins,* 627 F.2d at 646. The court held that the general rule applied; stating that "Where … a general verdict may rest on either of two claims—one supported by the evidence and the other not—a judgment thereon must be reversed." *Id.* citing *Albergo v. Reading Co.,* 372 F.2d 83, 86 (3d Cir.1966), *cert. denied,* 386 U.S. 983, 87 S.Ct. 1284, 18 L.Ed.2d 232 (1967).

plaintiff Doherty failed to prove a conspiracy between "two or more persons" as required by 42 U.S.C. § 1985(a).

A corporation cannot be convicted of conspiring with its own employees or agents as it can only act through its employees and agents. There was not an iota of evidence that the corporation, AMC, conspired with Doherty's attorney Manire. The district court erred in denying the corporation's motion for a directed verdict at the close of plaintiff's evidence and its motion for judgment N.O.V. The judgment of the district court should, therefore, be reversed and the cause remanded for dismissal of the complaint and not merely remanded for further proceedings as provided in the majority opinion.

## II

### Collateral Estoppel

Doherty's entire cause of action was also barred by the doctrine of collateral estoppel. Furthermore, Doherty testified falsely at the hearing before District Judge Bailey Brown where he changed his plea from not guilty to *nolo contendere*. He ought not to profit by giving false testimony.

The *nolo contendere* pleas were first submitted to Judge Brown by American Motors and John L. Houtaling. Judge Brown then addressed Doherty as follows:

THE COURT: You are, of course, Mr. A.J. Doherty?

MR. DOHERTY: Yes, sir.

THE COURT: Mr. Doherty, you are named in count two and four, is that right?

MR. DOHERTY: Yes, sir.

THE COURT: And the proposal is that you pay a fine, total fine of $3,000, $1,500 on each of these two counts, two and four, a Nolo Contendere plea, is that what you want to do?

MR. DOHERTY: Yes, sir.

THE COURT: Now, you believe you understand what you are charged with, do you not?

MR. DOHERTY: Yes, sir.

THE COURT: You have been here throughout this trial, of course?

MR. DOHERTY: Yes, sir.

THE COURT: And you know you are entitled to have the trial go on to completion if you want to?

MR. DOHERTY: Yes, sir.

THE COURT: You make this plea of Nolo Contendere freely and voluntarily?

MR. DOHERTY: Yes, sir.

THE COURT: Has anyone, by that I mean, anyone promised you anything in connection with this plea other than the proposed fine of $3,000?

MR. DOHERTY: No, sir.

THE COURT: Has anyone threatened you in any way?

MR. DOHERTY: No, sir.

THE COURT: You are not under the influence of any alcohol or drugs at this time?

MR. DOHERTY: No, sir.

THE COURT: And you are satisfied with your representation in this case?

MR. DOHERTY: Yes, sir.

THE COURT: And I take it now that if the Court imposes these fines that they will be paid within 15 days, can you do it, Mr. Doherty?

MR. DOHERTY: Yes, sir, I can do that.

THE COURT: All right. The court does find a basis in fact for these Nolo Contendere pleas based on the trial up to this point. Is there anything further from your side, Mr. Burch?

(App. 30a–33a).

The court then imposed the following sentence on Doherty. On a plea of *nolo contendere* of the defendant A.J. Doherty as to each of the two counts in which he's charged, it is the judgment of the court that he pay a fine of $1,500 in each of these counts, a total fine of $3,000, which must be paid by January 10, 1975. (App. 33a).

Doherty, by his attorney, William J. Weinstein, filed in the district court a Motion To Set Aside Plea of Nolo Contendere and Sentence and For a New Trial, Affidavit in Support Thereof, Memorandum of Authorities and Citations. Judge Bailey

Brown presided at the hearing which was attended by Doherty's attorney, Weinstein, and Larry Parrish, Assistant United States Attorney. Doherty did not even attend the hearing. His attorney, Weinstein, advised the court in answer to a question by the court as to whether Doherty was here and Weinstein stated he is not and is living in Hong Kong. The court heard only the statements and arguments of counsel. Weinstein called no witnesses to testify and none were called by the government. All had a full and fair opportunity to litigate. (App. 35a to 85a). Judge Brown, in denying the Motion stated:

THE COURT: Well, let me say this to you. At the time your client changed his plea from not guilty to nolo, all the proof was in—all we had left was Austin's testimony; and if this case had gone to the jury with all the proof in, the Court feels there would have been a very definite chance he would have been convicted, and if he had been convicted, I would have given him some time without any question about it, instead of giving him a $3,000.00 fine, I would have given him three or four years in the penitentiary. Now, that being true, I can't see where the great complaint is.

Doherty was fortunate in having his *nolo contendere* plea accepted because, after its acceptance, the trial proceeded against the defendant, Austin, who was found guilty by the jury.

Weinstein acted as Doherty's attorney in filing the present civil rights action.

AMC defended itself in Doherty's civil rights action on a number of different grounds, but principally on the grounds that no conspiracy could exist between itself and its own employees and that the action was barred by the doctrine of res judicata or collateral estoppel. It also alleged that Doherty testified falsely before District Judge Bailey Brown at the *nolo contendere* hearing and that Doherty ought not to be permitted to profit thereby.

The false testimony was admitted in the verified complaint filed by Doherty in his present civil rights action where he stated in paragraph 20:

That as a result of the threats, promises and coercion on the part of the conspirators, your plaintiff was compelled to enter a nolo contendere to the charges in the indictment, and he was "counselled" and compelled to *falsely testify* before the trial judge that he was satisfied with his counselling, that he understood the nature of the charges, that he made the plea of nolo contendere freely and voluntarily, that no one had threatened him, nor had they promised anything other than proposed fine of $3,000, because of his fear of consequences that if he did not do so that he would suffer irreparable harm, all the proximate cause of the actions of the co-conspirators, jointly and collectively (emphasis ours).

In the present civil rights action, Doherty testified under oath at the trial before a jury in answer to a question by his lawyer Weinstein as follows:

Q. Did you—were your answers to the Judge's questions true?

A. They were complete lies. (App. 103).

At the hearing before District Judge Brown on Doherty's Motion To Set Aside Plea Of Nolo Contendere And Sentence, and Motion For A New Trial, which Doherty neglected to even attend, he had a *full and fair opportunity* to litigate all of the issues involved in his civil rights action and the judgment entered by District Judge Brown denying said motion to set aside his plea of *nolo contendere* from which Doherty appealed to this court, which appeal was dismissed by this court for Doherty's failure to even file a brief in response to an order of this court to show cause, constituted res judicata or collateral estoppel. The question raised as to burden of proof is not applicable, as Doherty simply neglected to litigate all of the issues when he had a full and fair opportunity to do so.

During the trial of the present civil rights action, Doherty took a video tape deposition of Judge Brown, but Judge Brown adhered to his previous decision.

In *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), the Supreme Court in an opinion written by our Circuit Justice Potter Stewart applied the doctrine of collateral estoppel in a § 1983 proceeding to a state court criminal trial involving issues of search and seizure, where the state court held a hearing on respondent's motion to suppress evidence and respondent did not assert that the state courts had denied him a full and fair opportunity to assert his search and seizure claim and held that he was barred by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) in an action for damages filed under 42 U.S.C. § 1983 against police officers who entered his home and seized the evidence in question. This ruling should apply with equal force to federal criminal trials.

Other pertinent decisions on res judicata or collateral estoppel are: *Commissioner v. Sunne,* 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948); *Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951); *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Federated Department Stores v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427–2428, 69 L.Ed.2d 103 (1981); *McCord v. F. Lee Bailey,* 636 F.2d 606 (D.C.Cir.1980), *cert. denied,* 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981); *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

Sixth Circuit cases on collateral estoppel or res judicata: *Ivery v. United States,* 686 F.2d 410 (6th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1428, 75 L.Ed.2d 788 (1983) (Merritt, Jones and Weick, JJ.); *Coe, et al. v. Michigan Dept. of Education,* 693 F.2d 616 (6th Cir.1982) (Keith, Merritt and Peck, JJ.); *Coogan v. Cincinnati Bar Association,* 431 F.2d 1209, 1211 (6th Cir.1970) (Weick, Edwards and Brooks, JJ.). *Coogan*

was cited with approval by the Supreme Court in *Allen v. McCurry,* 449 U.S. 90, 97, fn. 9, 101 S.Ct. 411, 416 fn. 9, 66 L.Ed.2d 308 (1980), in an opinion written by our Circuit Justice Potter Stewart holding that in a damage suit against state police officers filed in the federal court under 42 U.S.C. § 1983, the decision of the state court in a criminal case on motion to suppress evidence that had been seized by police had collateral estoppel effect. We should uphold the decision of District Judge Bailey Brown.*

The judgment of the district court should be reversed and the cause remanded with instructions to dismiss the complaint.

* After the completion of this dissenting opinion, but prior to the publication of the majority opinion and the dissent, the Supreme Court of the United States in *United States v. Stauffer Chemical Company,* —— U.S. ——, 104 S.Ct. 575, 78 L.Ed.2d 388 on January 10, 1984, af-firmed the judgment of this court in *United States v. Stauffer Chemical Co.,* 684 F.2d 1174 (6th Cir.1982) and clarified the doctrine of collateral estoppel. It requires entry of the judgment provided for in the above dissenting opinion.